MHK

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | No. 10 C 6123 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Ronald Guzman |
| | ) | |
| AMERICAN TAX RELIEF LLC, | ) | |
| et al., | ) | Magistrate Judge Arlander Keys |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION AND ORDER**

On September 24, 2010, the Federal Trade Commission filed suit in this court, under Section 13(b) of the Federal Trade Commission Act (FTCA), seeking temporary, preliminary and permanent injunctive relief, among other forms of relief, against American Tax Relief, Alexander Seung Hahn (one of ATR's officers, directors and owners), Joo Hyun Park (Hahn's wife and an officer, director and owner of ATR) and Park's parents, Young Soon Park and Il Kon Park.  The FTC alleged that ATR, Hahn and Joo Park violated Section 5(a) of the FTCA by making false, misleading and deceptive representations concerning ATR's ability to secure relief for consumers on their tax debts.

With its complaint, the FTC filed an *ex parte* motion seeking a temporary restraining order ("TRO"), an asset freeze and the appointment of a receiver.  Judge Gottschall, sitting as the

emergency judge at the time, granted the FTC's motion; she issued a TRO effective through October 8, 2010, appointed the receiver nominated by the FTC and ordered the defendants to appear before Judge Aspen, the district judge to whom the case was then assigned, on October 7th - the day before the TRO was set to expire. The case was subsequently transferred to Judge Guzman, who entered an order continuing the TRO until October 22nd and setting the matter for a show-cause hearing that same day as to the preliminary injunction question. Judge Guzman then referred the matter to this Court, the parties consented to proceed before a United States Magistrate Judge as to the preliminary injunction question only, and the Court held a hearing on the matter on October 25, 2010. The parties subsequently consented to extend the TRO to November 5, 2010.

On November 4, 2010, this Court granted the FTC's motion for a preliminary injunction, but ordered the Receiver to release funds he had seized from a client trust account held on behalf of ATR at Sheppard, Mullin, Richter & Hampton. The parties appeared for a status hearing that next day, November 5, 2010, where the FTC challenged the Court's ruling with regard to the release of frozen assets and requested leave to brief certain issues raised by that release. The Court granted that request and set a short briefing schedule. The FTC, ATR and the Receiver have now all been heard on the issue. For the reasons explained in this

opinion, the Court declines to reconsider its ruling on the release of the Sheppard Mullin account. But the Court does agree that additional oversight measures are required to ensure that only reasonable fees and expenses are paid from that fund.

To begin with, the Court clearly has the authority to carve out from frozen assets funds to be used for attorneys' fees. And, indeed, the FTC seems to concede that this is permissible. The FTC wants to limit the amount of fees available, however. And it wants to decide what fees are, and are not, reasonable As the Court admonished at the last hearing, however, giving the FTC that much control over ATR's defense is like putting the fox in charge of the henhouse.

The cases on which the FTC relies certainly support the notion that frozen assets may be used to pay for ATR's defense. In *FTC v. Windemere Big Win International*, No. 98 C 8066, 1999 WL 608715 (N.D. Ill. Aug. 5, 1999), a case that, like this case, deals with the preliminary injunction phase, the court allowed the defendant to use frozen assets to pay its reasonable attorneys' fees. *Id.*, 1999 WL 608715, at *6. Similarly, in *FTC v. Amy Travel Service, Inc.*, 875 F.2d 564, 575-576 (7th Cir. 1989), the Seventh Circuit approved the payment of reasonable fees and expenses out of frozen assets. Although in that case the fees paid were no more than $70,000 - far less than what is at issue here, the key was not the specific amount of fees paid,

but the reasonableness of those fees under the circumstances.

In *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344 (9th Cir. 1989), the defendant had actually pled guilty to, and been convicted of, conspiracy, mail fraud and wire fraud and had agreed to liquidate and dissolve his operations and pay restitution of almost a million dollars, before the FTC even filed its civil suit, which was predicated on the exact same conduct. After an evidentiary hearing, the district court entered a preliminary injunction and froze the defendant's assets, carving out exceptions for living expenses and attorneys' fees - the latter at a capped rate of $90 per hour. *Id.* at 346. On appeal, the Ninth Circuit reversed the ruling with regard to the cap on hourly rates, noting that it was enough to state that the defendant could withdraw "reasonable sums for attorneys fees." *Id.* at 348. The Ninth Circuit advised that, if the district court "wishe[d] to limit the amount by which the frozen funds may be invaded for payment of attorney fees, it should set a maximum total sum which may be withdrawn or it should establish a minimum size to which the otherwise frozen assets may be reduced based upon appropriate findings." *Id.* (citing *Federal Savings & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 564-65 (5th Cir. 1987)).

Here, in contrast to *World Wide Factors*, there has been no indictment, let alone a conviction. If attorneys' fees were

permissibly paid out of frozen assets in that case, they are certainly permissibly paid out of frozen assets here. Moreover, what the Ninth Circuit said in that case concerning limits resonates here - especially because, at this point, it would be extremely difficult to estimate how much the defense of this matter should reasonably cost. The Court has already recognized that this is not a cut-and-dried case and that there are likely legitimate and serious issues to pursue at trial. Accordingly, other than the cap imposed by the limit of the Sheppard Mullin account, the Court will not impose a further cap on attorneys' fees. For now, it is enough to say that the fees, to be reimbursed from that fund, must be reasonable.

In *FTC v. Think Achievement Corp.*, 312 F.3d 259 (7th Cir. 2002), the Seventh Circuit actually determined that frozen assets could not be used to pay attorneys' fees. But at the time of the holding, the district court had already entered summary judgment in favor of the FTC - it had, in other words, determined that the defendant had engaged in fraud, as alleged by the FTC. *Id.* at 261. The district court, after entering summary judgment for the FTC, had nonetheless ordered the release of a portion of the frozen assets to be used to pay the lawyer who had represented the defendant in a criminal case arising out of the fraud; the Seventh Circuit reversed that part of the decision because, at that time, the defendant had no right to the money - the court

had already ruled that the entire fund constituted proceeds from the fraud. *Id.* at 262. The Seventh Circuit held that "once the court determined that all the frozen assets were either a product of fraud or necessary to compensate the victims of the fraud for their losses, [the defendant] had no right to use any part of the frozen money for his own purposes, purposes that included defending himself against criminal charges." *Id.* at 262. Significantly, the Court held that it was "okay for the district court, prior to the entry of the final judgment against [the defendant], to permit some of the frozen assets to be used to pay the lawyer who was defending him against the FTC's suit." *Id.*

Here, there has been no final judgment; there has been no final determination concerning fraud and no final determination concerning the amount of any restitution. And, at this point, the ownership of the frozen assets is still very much in issue. Although the FTC has represented that ATR scammed close to 20,000 consumers, to the tune of nearly $97 million, the evidence of record does not show anything close to that.

To date, the FTC has demonstrated that ATR has harmed, at most, roughly 420 consumers. Gary Almond of the Better Business Bureau represented that, "[s]ince 1999, the BBB has received more than 375 complaints on American Tax Relief, also known as American Tax Relief LLC ("ATR"), from consumers located across the United States." Almond Declaration, ¶9 (attached as Exhibit

PX 10 to the FTC's TRO Motion). Beyond that, the FTC has also submitted declarations from 43 individuals who claimed to be scammed by ATR - most of whom represented that they filed a complaint with the BBB and would, therefore, presumably be included in Mr. Almond's number, though for present purposes the Court will include them in the FTC's tally. In terms of losses, the 43 consumers paid ATR a combined total of $120,595, and suffered combined losses (after taking into account refunds and charge reversals) of $101,118.44, on average, $2351.59 per consumer. Assuming that average would apply to the 375 consumers referenced in Mr. Almond's declaration (the FTC has not offered any information concerning actual losses for these consumers), the total established losses would be just shy of $1 million ($982,964.62). Thus, if the Court were to make findings today concerning restitution, the seized assets would more than cover the established losses.

Additionally, as discussed in the Court's prior ruling, ATR has offered evidence to show that it obtained some measure of tax relief (an OIC or penalty abatement) for 341 consumers, suggesting that at least some of the frozen assets may be legitimate business revenue - money in which ATR would arguably have an ownership interest and money that ATR could (even if a final determination of fraud is made) arguably use to pay legal fees and expenses.

In short, the Court agrees that it has a duty to preserve assets where it has been shown that the seized assets are either the product of fraud or necessary to compensate the victims of the fraud for their losses. But neither has yet been shown here. To date, no finding of fraud, no violation of the FTCA has been established; the FTC has not yet proven that ATR engaged in fraud or that it fraudulently obtained frozen assets from consumers. The Court has determined that the FTC is *likely* to succeed on the merits of its claims, but that is not the same as saying that it has succeeded on the merits of its claims.

Second, although the FTC has claimed that the potential harm to consumers here may exceed $97 million, as explained, the harm demonstrated thus far does not even come close to that figure and, in fact, falls well within the range of the frozen assets. The consumers whose cases are profiled in the FTC's submissions did not lose anything close to the FTC's projection. And, thus far, the record shows that the consumers who were harmed by ATR outnumber only slightly those who were helped by ATR (418, compared with the 341 who were helped).

Having said that, the Court recognizes that the FTC has demonstrated the legitimacy of its allegations, and agrees that some type of oversight is appropriate here to ensure that only reasonable fees and expenses are paid out of the Sheppard Mullin account. That oversight should be undertaken by the Court,

however, and not the FTC. Accordingly, counsel for ATR are directed to submit to the Court, on a monthly basis and before the funds are withdrawn from the client trust account, detailed billing statements for attorneys' fees and expenses that include a description of the tasks undertaken, the names of the attorneys involved and the hourly rates charged. The Court will review the statements promptly and authorize the release of funds for those fees and expenses it deems reasonable. Given the concerns about the preservation of funds for potential restitution, counsel should not assume that the Court will approve the attorneys' regular hourly rates as being reasonable in this case.

A few additional issues require some attention. First, at this time, the Court will not require defense counsel to distinguish between the defense of the civil action brought by the FTC and any tasks it may undertake in connection with the criminal investigation. As ATR notes, the civil case and the criminal investigation are virtually identical, involving the same parties and the same conduct. Thus, at least at this stage, the defense of the civil suit likely overlaps substantially, if not entirely, with the representation in the criminal matter, and the Court sees no reason to add that extra layer of administration; the Sheppard Mullin account may be used to cover reasonable fees and expenses – whether they are incurred in connection with the civil suit, the criminal investigation or

both. *See, e.g., Think Achievement*, 312 F.3d at 262.

Second, the Court agrees with the FTC that the Sheppard Mullin account may not be used to defend non-defendants, even if they are or were employed by ATR. According to the representations of counsel, the Sheppard Mullin account was established as a client trust account on behalf of ATR; it was frozen as an asset of ATR and the defendants and, as such, the employees – all non-defendants at this juncture – have no right, no ownership interest, in those funds. ATR argues that, under section 2802(a) of the California Labor Code, it is obliged to indemnify its employees for costs incurred in defending themselves concerning conduct undertaken within the course and scope of employment. *See* Defendants' Response Regarding Release of Frozen Assets, p. 7. But even if the Court were to interpret that provision as broadly as ATR suggests, the employees have not been named as defendants in either matter and have thus not been called upon to defend their conduct in the first instance, making any question of indemnification decidedly premature.

Finally, there are a couple of points to be made about the Receiver, Thomas Seaman. First, the objections he filed are noted, but overruled, and the arguments he raised in his brief on the asset freeze are considered, but rejected. Given the representations by counsel concerning the source of the funds in the Sheppard Mullin account and the status of ATR as a d/b/a of

Joo Park, the Court sees no reason to draw the distinction urged by the Receiver between ATR and the individual defendants. Should an actual conflict of interest arise, the Court may revisit the issue.

ATR has asked the Court to remove Mr. Seaman as Receiver. To be sure, and as expressed in its ruling on the preliminary injunction motion, the Court was concerned with the way Mr. Seaman conducted himself in his initial dealings with ATR. Despite those initial concerns, however, the Court is persuaded that Mr. Seaman can still be effective as a Receiver, and, going forward, he has the Court's confidence and support. Should he determine that the Court's rulings have undermined his ability to do the job asked of him, he may seek leave to withdraw. However, the Court is of the mind that keeping Mr. Seaman in place is preferable to spending the time and money that would be necessary to get someone else up to speed. Accordingly, the Court denies ATR's request to replace Mr. Seaman as Receiver.

Conclusion

For the reasons explained more fully above, the Court declines to reconsider its decision to release the funds seized from the client trust account held by Sheppard, Mullin, Richter & Hampton. The Court agrees, however, that some oversight is necessary to ensure that the funds at issue are used to pay only

11

those fees and expenses that are reasonable. Accordingly, the Court will implement the measures explained in this decision to ensure that this is the case.

Date: November 24, 2010

ENTER:

*Arlander Keys*
ARLANDER KEYS
United States Magistrate Judge